# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
IN THE MATTER OF THE UNITED STATES OF AMERICA )
FOR A SEARCH WARRANT OF ONE PERSON )
)

Case No.  25-SW-262

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, hereby incorporated by reference.

located in the   Jurisdiction of the   District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | (Unlawful Possession with Intent to Distribute a Controlled Substance) |
| 18 U.S.C. § 922(g)(1) | (Unlawful Possession of Firearm by a Convicted Person) |
| 18 U.S.C. § 924(c) | (Carrying a Firearm During and in Relation to a Drug Trafficking Crime) |

The application is based on these facts:

See Affidavit in Support of the Application for Search Warrant

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

_____
*Applicant's signature*

Matt Nasen, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:   09/11/2025
_____

_____
*Judge's signature*

City and state:  Washington, D.C.
_____

Matthew J. Sharbaugh, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.    25-SW-262 |
| IN THE MATTER OF THE UNITED STATES OF AMERICA | ) |
| FOR A SEARCH WARRANT OF ONE PERSON | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of __Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A-2, hereby incorporated by reference.

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B-2, hereby incorporated by reference.

      **YOU ARE COMMANDED** to execute this warrant on or before   September 25, 2025   *(not to exceed 14 days)*
  ❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to __Matthew J. Sharbaugh, U.S. Magistrate Judge__
                                                          *(United States Magistrate Judge)*

    ❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: ___09/11/2025_____          _____
                                                                 *Judge's signature*

City and state:   Washington, D.C._____          Matthew J. Sharbaugh, U.S. Magistrate Judge
                                                                      *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: 25-SW-262 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A-1</u>

*Property to be searched*

The property to be searched is further described as follows. The property is currently being stored at The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), located at 90 K Street NE, Washington, D.C.

    A.  One (1) white Apple iPhone in a black case.

 

## ATTACHMENT A-2

*Persons to be searched*

The persons to be searched are further described as follows:

A. OSMAN MOHAMED, DOB: 01/05/1993, PDID: 706-027, who is currently in custody with the Central Detention Facility. The government seeks a sample of his cheek cells/saliva (buccal swab).



## ATTACHMENT B-1

*Property to be seized*

All items constituting evidence, fruits, and/or instrumentalities, in whatever form and however stored, relating to the commission of a controlled substance offense, in violation of 21 U.S.C. §§ 841(a)(1) (Unlawful Possession with Intent to Distribute a Controlled Substance), a firearms offenses, in violation of Title 18 U.S.C. § 922(g)(1) (Unlawful Possession of Firearm by a Convicted Person), and Title 18 U.S.C. § 924(c) (Carrying a Firearm During and in Relation to a Drug Trafficking Crime) (the "SUBJECT OFFENSES"), as described in the search warrant affidavit, including, but not limited to, the following:

a.  Establishing or documenting the commission of the SUBJECT OFFENSES;

b.  Identifying locations where the individual committed the SUBJECT OFFENSES, traveled to before and after the commission of the SUBJECT OFFENSES, and in preparation for the SUBJECT OFFENSES;

c.  Reflecting the ownership and use of the item identified in Attachment A by the individual committing the SUBJECT OFFENSES;

d.  Documenting meetings and communications between individuals committing one or more of the SUBJECT OFFENSES;

e.  Reflecting communications between the individual committing one or more of the SUBJECT OFFENSES and other individuals, discussing the commission of one or more of the SUBJECT OFFENSES;

f.  Reflecting communications between the individual committing one or more of the SUBJECT OFFENSES and other individuals who may have assisted or provided

support in the commission of one or more of the SUBJECT OFFENSES, to include photographs of illegal firearms, controlled substances, or large sums of money;

g. Containing photographs or video that would constitute evidence of a violation of the SUBJECT OFFENSES, to include photographs of illegal firearms, controlled substances, or large sums of money;

h. Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the SUBJECT OFFENSES; and

i. Any records and information relating to the sale or purchase of controlled substances and the possession, purchase, or sale of firearms;

j. Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the SUBJECT OFFENSES;

k. Evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

l. Evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4

m.  Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

n.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

o.  Evidence of the times the Device(s) was used;

p.  Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

q.  Documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

r.  Records of or information about Internet Protocol addresses used by the Device(s); and

s.  Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**ATTACHMENT B-2**

*Property to be seized from person of OSMAN MOHAMED*

All items constituting evidence, fruits, and/or instrumentalities of Title 18 U.S.C. § 922(g)(1) (Unlawful Possession of Firearm by a Convicted Person) by OSMAN MOHAMED as described in the search warrant affidavit, including, but not limited to, the following:

a. A sample of the deoxyribonucleic acid ("DNA") of the person identified in Attachment A to be collected via buccal or oral swab in accordance with established procedures, and to be analyzed forensically in accordance with the applicable, valid established procedures.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE UNITED STATES OF AMERICA FOR A SEARCH OF A WHITE APPLE IPHONE IN A BLACK CASE CURRENTLY IN THE POSSESSION OF THE ATF AT 90 K STREET NE, WASHINGTON, D.C., UNDER RULE 41** | **Case No. 25-SW-261 UNDER SEAL** |
| **IN THE MATTER OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT OF ONE PERSON** | **Case No. 25-SW-262 UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

1.      I, Matthew Nasen, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the following:

      a.   Search of one cellular phone seized from OSMAN MOHAMED which is currently in law enforcement possession (hereinafter, the "TARGET DEVICE"), as described in Attachment A-1, and the extraction from that property of electronically stored information as described in Attachment B-1;

      b.   Search of the cheek cells/saliva (buccal swab) of OSMAN MOHAMED (hereinafter "the buccal swab"), as described in Attachment A-2;

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since 2023. I graduated from the Criminal Investigator Training Program and ATF Special Agent Basic Training. I am currently assigned to the Washington Field Division in Washington, D.C. My assignments include investigating the illegal possession and transfer of firearms, as well as violent crimes involving firearms. During these investigations, I have analyzed records; participated in the search and seizure of phone, email, and social media records; conducted

mobile and static surveillance; conducted interviews; and participated in the execution of search and arrest warrants.

3.    I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2510(7) of Title 18, United States Code. As a federal law enforcement officer, I am authorized to investigate violations of laws of the United States, including the crimes outlined herein, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.    The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.    Based on my training and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause believe that OSMAN MOHAMED has committed the SUBJECT OFFENSES, including Title 18 U.S.C. § 922(g)(1) (Unlawful Possession of Firearm by a Convicted Person), Title 21 U.S.C. §§ 841(a) (Possession with Intent to Distribute a Controlled Substance), and Title 18 U.S.C. § 924(c) (Carrying a Firearm During and in Relation to a Drug Trafficking Crime) and that the TARGET DEVICE contains evidence, fruits, or instrumentalities of the commission of the SUBJECT OFFENSES. There is also probable cause to search the TARGET DEVICE, further described below and in Attachment A-1 and for the things described in Attachment B-1.

6.    Based on my training and experience, and the facts set forth in this affidavit, I

8

further submit that there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found located in the cheek cells/saliva (buccal swab[1]) of OSMAN MOHAMED. Specifically, a buccal swab from MOHAMED will be used to test against DNA profiles that were developed from a firearm seized from MOHAMED's possession on September 5, 2025.

## **PROBABLE CAUSE**

7.      All of the following events occurred in the District of Columbia unless otherwise noted.  The following statement is presented for the sole purpose of establishing probable cause and does not represent the totality of facts and circumstances known to your affiant, Special Agent Matthew Nasen of the ATF. Your affiant was not on the scene of the stop, arrest or detention of the defendant. Your affiant therefore did not witness any part of this offense.

8.      On Friday, September 5, 2025, officers of the Metropolitan Police Department ("MPD") Fifth District Crime Suppression Team ("CST"), were engaged in the "Make DC Safe and Beautiful Taskforce" Operations. MPD Officers were part of a federal task force which included HSI, ATF, FBI, DEA, Secret Service Police, and United States Park Police. The CST members were dressed in full MPD Uniform and operating marked police vehicles. All CST members were equipped with working body worn cameras.

9.      At approximately 8:40 p.m., MPD Officer R. Orr was driving a marked police vehicle with fellow MPD Officer R. Brooksbank in the front passenger seat, Deputy United States Marshal M. Little in the right rear passenger seat, and DEA Agent V. Aiello in the left rear passenger seat. Law enforcement was actively patrolling by vehicle traveling westbound in the

---

[1] As the Supreme Court has recognized, a "buccal swab" is a "common procedure" that involves "wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells."  Maryland v. King, 133 S. Ct. 1958, 1967-68. This procedure is "quick and painless" and poses "no threat to the health or safety" of a defendant. Id. at 1968.

Unit block of Patterson Street NE when we observed a silver BMW bearing Virginia Registration THX7051 that was occupied, running and illegally parked. Specifically, the vehicle was parked directly in front of an "Emergency No Parking" sign that had the dates of 09/05/2025 to 09/09/2025 restricted and the hours restricted being "24 Hours".

10.     MPD Officer R. Orr brought his vehicle to a stop to make contact with the sole occupant and driver of the silver BMW, later identified as MOHAMED. Officer R. Orr observed white smoke billowing from within the cabin of the vehicle, as MOHAMED had the interior dome light illuminated.

11.     As Officer R. Orr exited the marked police vehicle, Officer R. Orr began to detect the odor of burnt marijuana emanating from the vehicle. At approximately the same time as Officer R. Orr exited the vehicle, MOHAMED exited the silver BMW. MOHAMED was the only individual within the immediate area.

12.     Subsequently, Officer R. Orr advised MOHAMED that he was stopped and not free to leave, as the officers investigated the potential public consumption of marijuana.

13.     With MOHAMED stopped, Officer R. Orr proceeded to open the driver's side of the door and observed, in plain view, an orange tinted bottle that is consistent with Promethazine. At further inspection, Officer R. Orr observed that the label of the Promethazine had been tampered with, and the bottle was approximately ¼ filled (4oz in weight) with a dark in color liquid. With the rear label being observed as clearly tampered with, Officers observed the following warnings label, "CAUTION: Opioid. Risk of overdose with addiction", as is consistent when Promethazine is mixed with Codeine.

14.     A further probable cause search of the remainder of the vehicle revealed the additional following items that were recovered:

- White hand-rolled blunt with a charred tip (located in a cup next to where Defendant Mohamed was seated inside the vehicle).

- Orange prescription bottle with tampered label that consisted of 119 pink / round pills stamped "K 56" (located in the center console of the vehicle).

- Black scale with green-leafy residue (located in the center console of the vehicle).

- Six (6) THC Pens (located in black satchel on driver side floorboard).

- One (1) THC Vape (located in black satchel on driver side floorboard).

- US Currency totaling $1,402.45 (located in black satchel on driver side floorboard).

    o Four (4) $100 bills

    o Fourteen (14) $50 bills

    o Fifteen (15) $20 bills

    o Two (2) $1 bills

    o One (1) 25¢

    o Four (4) 10¢

- Five (5) Mylar bags containing green-leafy substance consistent in appearance with marijuana weighing approximately 91.35g (located in a black backpack in the trunk of the vehicle).

- Three (3) multi-colored Mylar bags containing green-leafy substance consistent in appearance with marijuana weighing approximately 55.86g (located in a black backpack in the trunk of the vehicle).

- Two (2) large Mylar bags containing green-leafy substance consistent in appearance with marijuana weighing 95.22g (located in a black backpack in the trunk of the vehicle).

- One (1) canned Mylar containing green-leafy substance consistent in appearance with marijuana weighing 57.22g (located in a black backpack in the trunk of the vehicle).





15.    In total, officers recovered approximately of 299.96g or 10.6oz of green-leafy substance. Officer R. Brooksbank tested a portion of the substance which yielded a positive color reaction to a marijuana-based product at 22:52 hours at the 1ˢᵗ District.

16.    A query from Drugs.com revealed that the pink round pills stamped K56 are consistent with Oxycodone Hydrochloride 10mg. Oxycodone is a Schedule II narcotic controlled substance that requires a valid prescription, meaning it has high potential for abuse.

17.    At the time of recovery, Defendant Mohamed did not have a valid prescription for

the recovered Oxycodone Hydrochloride.

18.    Based on Officer R. Orr's training and experience, Officer R. Orr recognized that the quantity of narcotics and the particular packaging of narcotics were consistent with quantities possessed by individuals intending to distribute the substance and inconsistent with possession for personal use.

19.    Furthermore, officers continued the probable cause search and located a Smith & Wesson M&P 40 Shield .40 caliber handgun underneath the floor mat on the right rear passenger side of the vehicle. The recovered firearm has a serial number of JCN4190. At the time of the recovery, the firearm had one (1) live round of ammunition in the chamber and six (6) rounds of live ammunition inside the magazine that had a capacity for seven (7) rounds.

20.    A query revealed that the silver BMW was registered to MOHAMED, and as previously mentioned, he was the sole occupant of the vehicle.

21.    A query utilizing law enforcement tools revealed that MOHAMED had been previously convicted with a crime punishable by more than one year. Specifically, in December 2023, MOHAMED was convicted of felony possession of a Schedule I or II in Arlington County Circuit Court.

22.    Because there are no manufacturers of firearms or ammunition in the District of Columbia, the firearm and ammunition recovered from the silver BMW, necessarily traveled in interstate commerce.

23.    Furthermore, as a convicted felon, MOHAMED would not be legally allowed to purchase a firearm from a federal firearms licensee. Therefore, any person who provided him with the firearm likely did so in an unauthorized fashion and without any belief that the defendant would have registered the firearm and complied with the firearms laws in Washington, D.C., therefore

having reasonable cause to believe that the use, carrying, or possession of the firearm by the defendant would constitute a felony, in violation of 18 U.S.C. § 933. Similarly, MOHAMED, as a convicted felon, knew, or had reasonable cause to believe, that it would constitute a felony to possess the firearm, in violation of 18 U.S.C. § 933.

## THE BUCCAL SWABS

24.     Through my training and experience, I am familiar with the fact that each person has a unique DNA composition. DNA isolated from blood, hair, skin cells, or other genetic evidence left at the scene of a crime or left on evidence of a crime can be compared with the DNA of an individual to identify an individual as a potential suspect.

25.     The physical evidence, namely the firearm and extended magazine, in this case is currently being stored in the District of Columbia and will be swabbed for potential DNA.

26.     A buccal swab from MOHAMED is needed in order to compare his profile to any interpretable/usable DNA profiles developed from swabs of the firearm and magazine.

27.     MOHAMED is currently in custody in case 25-MJ-209.  Your Affiant will coordinate obtaining the buccal swabs from MOHAMED with the Central Detention Facility.

## IDENTIFICATION OF DEVICES SEIZED

28.     The following device was recovered from OSMAN MOHAMED at the time of his arrest:

A.  One (1) white Apple iPhone in a black case, currently stored by ATF located at 90 K Street NE, Washington, D.C.

29.     The TARGET DEVICE was seized by members of the Metropolitan Police Department ("MPD") from MOHAMED and is currently being stored by ATF, located at 90 K Street NE, Washington, D.C.

14

## BACKGROUND ON CELLULAR DEVICES

30.    Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that criminals and/or conspirators and individuals use cell phones, other electronic devices, electronic mail ("e-mail"), and social media to conduct their illegal activity, to preserve and distribute photographs and videos in order to memorialize previous illegal activity, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals. This is particularly true in drug cases, where cellular devices are often used to market controlled substances, to obtain controlled substances to sell, and to set up meetings with potential buyers or sellers. Based on my training and experience, the marketing of controlled substance often involves the sending photographs of controlled substances via a messaging or social media application.

31.    Communication between MOHAMED and any co-conspirators is evidence of the motivation in the commission of the offenses described above. Digital artifacts and copies of these communications will likely remain on the devices on which these communications occurred, including the TARGET DEVICE. This is particularly true in cases drug distribution cases and cases involving firearms in conjunction with controlled substances. Based on my training and experience, communications often reveal that the target intended to possess controlled substances to sell them, rather than for personal consumption. Moreover, communications regarding the obtaining of firearms can indicate that the firearm possession was in connection with the drug trafficking offense by showing that the firearm was obtained to protect the controlled substances themselves or the proceeds of the distribution, which is often cash.

32.    There is probable cause that further evidence of the SUBJECT OFFENSES will be found following a forensic search of the TARGET DEVICE, including but not limited to:

(1) communications between MOHAMED and any co-conspirator regarding the offense under investigation, (2) communications, images, or other information or records related to the use, possession of, access to, transfer, or related possession of one or more firearms, and (3) communications, images, or other information or records related to the use, possession of, access to, transfer, or related possession of controlled substances.

33.     There is also probable cause to believe that the TARGET DEVICE will contain call logs, text messages, emails, images or video recordings that will provide information about any coconspirators, collaborators, and facilitators of MOHAMED in the commission of the SUBJECT OFFENSES, such as individuals MOHAMED purchased or sold controlled substances to.

34.     There is probable cause to believe that the TARGET DEVICE contains communications relevant to the SUBJECT OFFENSES and thus of the identities of potential co-conspirators and facilitators. Evidence of prior communications, exchanged videos or images, or voicemails are all relevant evidence that would tend to show violations of the SUBJECT OFFENSES. Based on my training and experience, I know that witnesses and perpetrators of crime in Washington, D.C. often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment A-1 and B-1, this application seeks permission to search for information that might be found within the TARGET DEVICE. Based on my knowledge, training, and experience, as well as information related to me by agents and others

involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B-1 will be stored in the TARGET DEVICE for at least the following reasons:

a.    Individuals who engage in criminal activity often use digital devices to facilitate illegal activity and to communicate with co-conspirators; to store on digital devices, like the devices seized in this case, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; and contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods

17

of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

36.    As further described in Attachment B-1, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the SUBJECT OFFENSES, but also for forensic electronic evidence or information that establishes how the TARGET DEVICE were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICE because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable

18

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      b.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

37.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital

20

devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software

21

requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed,

encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cellular phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

38.    Based on all of the foregoing, I respectfully submit that searching the TARGET DEVICE for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created

challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

39.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital device may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

## TECHNICAL TERMS

40.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

b.    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. See 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

c.    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

d.    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices);

peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

   e.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

   f.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as

26

described above, and personal computers, perform many different functions and save data associated with those functions.

g.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

i.    "Computer software" means digital information, which can be interpreted by

a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

41.     Based on my training, experience, and research, I know that the TARGET DEVICE have the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the SUBJECT OFFENSES under investigation.

## CONCLUSION

42.     Based upon the above-referenced facts, your affiant submits that there is probable cause to believe that a buccal swab taken from MOHAMED as identified in Attachment A-2, may contain evidence that connects MOHAMED to (or excludes him from) the SUBJECT OFFENSES.

43.     Your affiant further submits that there is probable cause to believe that the TARGET DEVICE (as described in Attachment A-1) contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES (as described in Attachment B-1). Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. I further request that the Court permit the search warrant to be executed at any time of day or night given that the TARGET DEVICE is in ATF custody in the District of Columbia.

Matthew Nasen
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 11, 2025.

_____
MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE